936 F.2d 674
 Fed. Sec. L. Rep. P 96,046, 19 Fed.R.Serv.3d 1469,
RICO Bus.Disp.Guide 7783
 James O'BRIEN, Sheldon Friedman, Eugene Gans, Sheldon Smith
and James Errant, individually and on behalf of all other
persons similarly situated and derivatively on behalf of
WACO Associates, Roger Arkansas Associates, Somerset
Kentucky Associates, University Mall Associates and a class
of all partnerships set forth on Exhibit "A" hereto,
Plaintiffs-Appellants,
v.
NATIONAL PROPERTY ANALYSTS PARTNERS, et al., Defendants,
Price Waterhouse and Howard Jackson Associates, Inc.,
Defendants-Appellees.
 No. 795, Docket 90-7715.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 7, 1991.
Decided June 17, 1991.
 
 Herbert Beigel, New York City (Elizabeth M. Toll, Lewis S. Sandler, Beigel & Sandler, Ltd., of counsel), for plaintiffs-appellants.
 Asa Rountree, New York City (David W. Rivkin, Edwin G. Schallert, Debevoise & Plimpton, Rodman W. Benedict, Associate Gen. Counsel, Price Waterhouse, of counsel), for defendant-appellee Price Waterhouse.
 Before KEARSE, WINTER and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiffs-appellants, a group of investors, appeal from a judgment entered in the United States District Court for the Southern District of New York (Peter K. Leisure, Judge ), dismissing their third amended complaint with prejudice, after the court concluded that the complaint failed to plead fraud with particularity as required by Federal Rules of Civil Procedure 9(b). On appeal, plaintiffs-appellants argue that their allegations that defendant-appellee Price Waterhouse, a financial auditor, rendered positive financial opinions based on an unsound prospectus are sufficient to withstand scrutiny under Rule 9(b).
 
 
 2
 For the reasons set forth below, the judgment of the district court is affirmed.
 
 BACKGROUND
 
 3
 Plaintiffs-appellants ("plaintiffs") are a class of individuals who invested in four limited partnerships during the late 1970s and early 1980s. The partnerships were designed to offer investors legitimate tax benefits through the purchase and operation of shopping malls. The four partnerships operated according to a scheme created by National Property Analysts Partners ("NPA"), the entity that established, sponsored, and managed each of the four organizations.
 
 
 4
 Each of the partnerships operated in the same basic fashion. Generally, NPA or one of its affiliates would purchase a shopping mall for a small cash down payment and a promissory note, and would then sell the property at a slightly increased price to one of several pension plans. Subsequently, NPA, through private placement memoranda, would solicit investors for the limited partnerships. Once fully subscribed, the limited partnerships would purchase the malls from the pension funds at an even higher price. The partnerships would fund these purchases by obtaining wrap-around mortgages issued at above-market rates. Ordinarily, the terms of the mortgages would require the partnerships to make a number of large payments during the first years after the property was purchased. After obtaining the mortgages, the partnerships would lease the property back to NPA or one of its affiliates under Master Leases, in return for monthly rental payments. NPA would generally act as the manager of the properties and would collect rent from commercial tenants.
 
 
 5
 Price Waterhouse and Howard Jackson Associates ("Jackson Associates"), a professional appraiser, each played a limited role in the general investment scheme. NPA hired both organizations to render opinions on the proposed investment, based on financial data which NPA prepared. Price Waterhouse agreed to give its opinion and subsequently issued reports which NPA appended to its private placement memoranda. In these reports, Price Waterhouse essentially stated that, based on its review of the data supplied to it, it found that the projections supplied in the memoranda "contain all significant disclosures necessary for an understanding of management's projections and the underlying assumptions provide a reasonable basis for management's projections." It qualified such statements by recognizing that "some assumptions inevitably will not materialize and unanticipated events and circumstances may occur; therefore, the actual results achieved during the projection period will vary from the projections, and the variations may be material." Similarly, Jackson Associates, a professional real estate appraiser, rendered opinions on the fair market value of various properties bought by the limited partnerships.
 
 
 6
 In June 1988, sixty plaintiffs who had invested in the four partnerships filed a complaint against NPA and its affiliates, as well as Price Waterhouse and Jackson Associates, claiming that these organizations had made fraudulent representations in the private placement memoranda soliciting investors. The complaint pleaded violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. Sec. 240.10b-5, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 ("RICO"), et seq., and various state laws. After the complaint was filed, the plaintiffs and all of the defendants--except Price Waterhouse and Jackson Associates--entered into a settlement agreement. At the time the court approved the agreement, it granted plaintiffs' oral request to file a second amended complaint.
 
 
 7
 Plaintiffs subsequently filed the second amended complaint which conformed the first amended complaint to the settlement agreement. Both Price Waterhouse and Jackson Associates moved to dismiss the complaint for, inter alia, failure to plead fraud with the requisite particularity. The district court granted the motions without prejudice. See O'Brien v. National Property Analysts Partners, 719 F.Supp. 222 (S.D.N.Y.1989). Subsequently, the plaintiffs filed a third amended complaint. Once again, Price Waterhouse and Jackson Associates moved to dismiss, arguing that the allegations of fraud were still deficient under Fed.R.Civ.P. 9(b). Upon finding that the third amended complaint merely "elaborat[ed] and increased [the] verbiage concerning the same core allegations initially put forward," the district court, in a well-reasoned opinion, again granted defendants' motion to dismiss. See O'Brien v. Price Waterhouse, 740 F.Supp. 276 (S.D.N.Y.1990). This time, however, the court dismissed the complaint with prejudice and entered judgment on behalf of Price Waterhouse and Jackson Associates.
 
 
 8
 Plaintiffs now appeal from the judgment, arguing that the district court erred by concluding that their complaint had not pleaded fraud with the requisite particularity. Because Jackson Associates filed for bankruptcy shortly after the district court ruled on the third amended complaint, the appeal with respect to Jackson Associates has been automatically stayed. See 11 U.S.C. Sec. 362(a)(1) (1988). Accordingly, on this appeal, we will address only plaintiffs' claims regarding Price Waterhouse.
 
 DISCUSSION
 
 9
 The central question presented on this appeal is whether plaintiffs pleaded fraud with the requisite particularity to satisfy Fed.R.Civ.P. 9(b). In their third amended complaint, plaintiffs alleged that Price Waterhouse and Jackson Associates fraudulently induced their investment in the four limited partnerships, in violation of federal securities laws, RICO, and various state laws. Because plaintiffs premise these claims, in large part, on defendants' alleged fraudulent conduct, plaintiffs must comply with Rule 9(b), which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."
 
 
 10
 The purpose of Rule 9(b) is threefold--it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect a defendant against the institution of a strike suit. See Ross v. Bolton, 904 F.2d 819, 823 (2d Cir.1990); Stern v. Leucadia National Corp., 844 F.2d 997, 1003 (2d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987). Thus, although Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs "to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990); see Devaney v. Chester, 813 F.2d 566, 568 (2d Cir.1987); Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Wexner, 902 F.2d at 172. An ample factual basis must be supplied to support the charges.
 
 
 11
 In reviewing a decision to dismiss a complaint on Rule 9(b) grounds, we assume the truth of plaintiffs' allegations. DiVittorio, 822 F.2d at 1244. Here, plaintiffs make two basic allegations against Price Waterhouse. First, plaintiffs claim that Price Waterhouse knew of the impossibility of the venture succeeding commercially. Plaintiffs specifically aver that the financial projections upon which Price Waterhouse relied were based on assumptions "without reasonable basis whatsoever" and that Price Waterhouse knew these assumptions had no basis when it opined that they were reasonable. In particular, plaintiffs claim that the rental payments that tenants of the malls made to NPA or its affiliates could not have grown rapidly enough to satisfy the terms of the Master Leases between NPA and each of the limited partnerships.
 
 
 12
 As the district court noted, however, Price Waterhouse plainly asserted and reiterated in its report that its conclusions were based on market assumptions, and that the projections on which the report was based could easily fail to come to fruition. More precisely, Price Waterhouse's Report stated: "The projected data is management's estimate of possible, but not necessarily most likely, financial results for the projection period.... [S]ome assumptions inevitably will not materialize and unanticipated events and circumstances may occur; therefore, the actual results achieved during the projection period will vary from the projections, and the variations may be material."
 
 
 13
 We note, moreover, that the private placement memoranda fully disclosed that rentals based on a percentage of sales by tenant retailers would have to increase very substantially for the venture to be economically viable. That fact was obvious on the face of the projections. While we recognize that doubt might have existed as to whether the substantial increase in sales was likely to occur, the unpredictability of future economic conditions, including the wide variation of the rate of inflation over recent years, rendered that increase a possibility. No more than that was suggested by Price Waterhouse. We further note that the prospect of economic success was, at the time of investment, a remote motive for making such an investment. As the papers before us indicate, tax deductions, rather than profits, were the immediate benefit to be expected by an investor, and the immediate prospects of the venture were for substantial losses. The projections themselves thus suggested that the probability of profits lay only in the distant and uncertain future.
 
 
 14
 Second, plaintiffs pleaded that Price Waterhouse, as NPA's financial auditor, knew of the partnerships' impending financial difficulties, but nevertheless continued to aver that financial projections in subsequent partnership offerings were reasonable. However, plaintiffs fail to allege particulars regarding Price Waterhouse's purported discovery that NPA's net worth was declining. This claim is the very type of unsubstantiated allegation that Rule 9(b) prohibits. Moreover, in the private placement memoranda which Price Waterhouse's report accompanied, it specifically states that "[n]o assurance can be given that NPA Partners will have sufficient assets or net worth to meet its obligations under the Master Lease."
 
 CONCLUSION
 
 15
 Based on the foregoing, the judgment of the district court dismissing the complaint against Price Waterhouse is affirmed.